**EXHIBIT A**

**MOTION TO SUPPRESS AND FOR EVIDENTIARY HEARING**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 06 CR 575 |
| v. | ) | |
| | ) | Honorable Joan H. Lefkow |
| ABRAHAM LIRA ET AL., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANT ROSALES' MOTION TO SUPPRESS STATEMENTS
AND FOR AN EVIDENTIARY HEARING**

Defendant Jessica Rosales ("Rosales"), by her attorney, Timothy P. O'Connor,

respectfully requests that this Court enter an Order suppressing oral and written statements that

she apparently made to FBI agents while in the custody of the Berwyn Police Department very

late in the evening of December 4, 2007 and possibly also in the very early morning hours of

December 5, 2008.  In support thereof, Rosales states as follows:

**BACKGROUND**

On December 4, 2007, the Harris Bank in Berwyn was robbed.  In the course of the

investigation, Berwyn Police identified Abraham Lira as a suspect.  According to law

enforcement reports produced by the government, Lira was arrested by Berwyn officers at mid-

day on December 4 outside a house where he had been living with Jessica Rosales.  At

approximately 8:00 pm, a Berwyn detective had a cell phone conversation with Rosales, who

was in Chicago, and asked that she let law enforcement officers come meet her in Chicago and

bring her to the Berwyn Police station for questioning.  The Detective told Rosales, in essence,

that if she simply told law enforcement officers where the money from the bank robbery was – or

turned the money over – and told law enforcement officers what they "needed to know" everything "would be alright," she would "not have to worry" and she "could go home."  Rosales agreed to come to the Berwyn Police station and was picked up in Chicago by law enforcement officers and brought to the Berwyn Police station.

As of December 4, 2007, Rosales was eighteen years old by just under six months.[1]  She was a high school senior, but she only had attended classes the first week of her senior year.  She was in special education classes at high school.  She has been in special education classes all her life.  Her particular difficulties are with reading and writing. In her sophomore year she tested at a sixth grade reading level.  She has a very disturbing, sad background.  Both of her parents are heroin addicts.  Her father, Jesse Rosales, was living on the streets.  Her mother, Alice Huerta, lived in Berwyn.  But Rosales had been removed from her mother's care in 2000 because of her mother's heroin addiction.   Although Rosales had been reunited with her mother in 2003, she was not staying with her at the time of the robbery because of a dispute between them over her relationship with Lira, a twenty-one year old, and the fact that Rosales had become pregnant in February, 2007.  The child was still-born on August 24, 2007.  Rosales was hospitalized for five days afterward.

At the time of the robbery, Lira and Rosales were living with Cindy Huerta, Rosales' aunt.  In fact, since being reunited with her mother, Rosales only had lived with her off and on and had lived in a number of other places besides with her mother.  Rosales had attempted suicide three times, twice by attempting to slash her wrists in 2002 and once by attempting to hang herself in 2006.  She was hospitalized for a month and a half in 2004 at Riveredge Hospital in Forest Park.  She also had outpatient mental health counseling for 3 to 4 months in 2006 at the

---

[1]        Rosales was born on June 16, 1989.

Fillmore center in Berwyn.[2]  Rosales had very limited experience with the criminal justice system, having been arrested just once before for burglary, an incident that did not result in a conviction.

When Rosales arrived at the Berwyn Police station, she asked a law enforcement officer (a tall white male with blondish hair who presumably was a Berwyn Officer) if she could speak to her mother and Lira.  The officer told Rosales that she would have to wait until after she had been questioned.  Unbeknownst to Rosales, her mother had been at the Berwyn Police station both earlier that day and when Rosales was brought in that evening.  Rosales also was unaware that her mother had asked to see her but had been told that she could not see her daughter because she was being questioned.[3]

Rosales was interviewed by the FBI at the Berwyn Police station.  She was apprised of her rights and signed an FD-395 form waiving those rights at 11:15 pm on December 4.  FD-395 Advice Of Rights Form, attached hereto as Exhibit A.  She also signed a waiver with respect to the timing of her initial appearance before a United States Magistrate Judge at 12:00 am on December 5.  Waiver Concerning Timing Of Initial Appearance Before United States Magistrate Judge, attached hereto as Exhibit B.  According to documents produced by the government,

---

[2]     The facts set forth in this paragraph are drawn largely from the Pretrial Services Report, which is not attached hereto because it is confidential.  Other facts in this paragraph and in this background section will be supported by witness testimony in the event that the Court grants an evidentiary hearing on this Motion.  No affidavit is submitted in support of this Motion because, Rosales respectfully submits, an affidavit is not required to support a Motion to Suppress.  See, e.g., United States v. Diaz, 2004 WL 1093487 at *2 (N.D. Ill. 2004) (Lefkow, J.) (noting that the Seventh Circuit has never held that an affidavit is required to make the requisite showing necessary for an evidentiary hearing on a motion to suppress).

[3]     Rosales' mother is expected to testify that she arrived at the station for her second visit at approximately 12:00 am on the evening of December 4, which would place her in the station after her daughter had arrived, but she also is expected to testify that she arrived before her daughter was brought into the station and was there when she came in.  Rosales submits that her mother likely is incorrect about the exact time that she was present at the station but is correct about being present before, during and after her daughter's arrival.

Rosales made an oral statement to FBI agents late on the evening of December 4, 2007 and possibly also in the very early morning hours of December 5.  December 18, 2007 Report of Interview Of Jessica Rosales, attached hereto as Exhibit C.  Rosales also apparently made a written statement at approximately this same time.  Written Statement Of Jessica Rosales, attached hereto as Exhibit D.[4]

In the wake of its investigation, the government charged not only Lira – the person whom the government contends entered Harris Bank, presented a demand note and took money – with bank robbery but also charged  (1) Rosales both with conspiring with Lira to rob the bank and with knowingly concealing and possessing funds stolen from the bank and (2) Rosales' cousin, Roberto Navar, with knowingly concealing and possessing funds stolen from the bank. Indictment, R. 19.

## <u>ARGUMENT</u>

This Motion is premised not so much upon any wrongdoing by law enforcement agents[5] as it is upon Rosales' own very significant burdens in life and the other circumstances surrounding her waiver of rights and statements: her youth; her very significant cognitive limitations; her severe history of depression and mental illness; her lack of contact with her mother or any other interested adult; her lack of sophistication and familiarity with the criminal justice system; the lateness of the hour when she was asked to make the momentous decision to waive her rights and speak to law enforcement agents; the fact that she had been told that by coming in and speaking to law

---

[4]     Law enforcement reports state that, when she was picked up by police, Rosales had a backpack that later was found to contain some of the bank robbery money.

[5]     To the extent that government coercion or misconduct is a necessary predicate to this Motion, Rosales points to the statements of Berwyn Officers that (1) if she spoke to law enforcement, "everything would be alright," she would have nothing "to worry" about and she could "go home" and (2) she would have to wait until after she was questioned to speak to her mother.  These statements may (only an evidentiary hearing will settle the question) have been uttered with good intentions but their ultimate effect was to mislead Rosales.

enforcement agents "everything would be alright," she would not "not have to worry" and she

would be able to "go home"; and the fact that she had been told that she could see her mother *after*

she had been questioned.  As explained more fully below, under these circumstances, no waiver of

rights or statement by Rosales could be knowing and voluntary.   Both her waiver of rights and her

subsequent written and oral statements therefore were involuntary and should be suppressed.

In Gilbert v. Merchant, 488 F.3d 780 (7th Cir. 2007), the Seventh Circuit reviewed both the

law governing the voluntariness of statements and the particular legal doctrines that apply when a

statement is obtained from a juvenile[6]:

> Whether a confession was voluntary depends on the totality of the circumstances
> surrounding that confession, including both the characteristics of the accused and the
> details of the interrogation that resulted in the confession…. [T]he voluntariness of
> juvenile confessions must be evaluated with special care. … Relevant considerations
> include the juvenile's age, experience, education, background and intelligence, and
> … whether he has the capacity to understand the warnings given him, the nature of
> the Fifth Amendment rights and the consequences of waiving those rights…. The
> length of time that the juvenile was questioned by the authorities and the absence or
> presence of a parent or other friendly adult are additional factors that bear on the
> voluntariness of the juvenile's confession … A juvenile's ability to consult with a
> friendly adult is relevant because … a teenager may not on his own be able to fully
> appreciate what is at stake when the police seek to question him….

Gilbert, 488 F.3d at 791 (citations and internal quotations omitted); see also A.M. v. Butler,

360 F.3d 787, 799-800 (7th Cir. 2004) (setting forth standard governing juvenile statements).

The Gilbert court noted that the Supreme Court has recognized especially that "a teenager

may not on his own be able to fully appreciate what is at stake when police seek to question

him":

> He cannot be compared with an adult in full possession of his senses and
> knowledgeable of the consequences of his admnissions.  He would have no way of

---

[6]    As discussed infra, Rosales respectfully submits that, on the basis of the facts and circumstances
present here, the legal doctrines governing the taking of statements from juveniles should apply to her
case despite the fact that she had reached the biological age of eighteen by the time of her interview by
law enforcement officers in this case.

knowing what the consequences of his confession were without the advice as to his right – from someone concerned with securing him those rights  -- and without the aid of more mature judgment as to steps he should take in the predicament in which he found himself.  A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not.  Adult advice would have put him on a less unequal footing with his interrogators.  Without some adult protection against this inequality, a fourteen-year-old boy would not be able to know, let alone assert, such constitutional rights as he had……

Id (quoting Gallegos v. Colorado, 370 U.S. 49, 54 (1962).[7]

Applying the foregoing standards to this case, Rosales respectfully submits that her statements should be suppressed – and that this Court should hold an evidentiary hearing on this Motion -- for the following reasons:

First, Rosales respectfully submits that this Court should assess the voluntariness of her waiver of rights and subsequent statements under the standards used to assess statements made by juveniles, as set out in cases like Gilbert and Butler.  There is no legal bar to such an analysis; to the contrary, the familiar test governing an assessment of the voluntariness of statements permits this Court to take into account the "totality of the circumstances" and the particular "characteristics of the accused and the details of the interrogation." Gilbert, 488 F.3d at 791; Butler, 360 F.3d at 799.  Here, even a brief perusal these factors makes clear that Rosales was in every sense (except the narrow, technical legal sense that she had reached the biological age of eighteen[8]) a juvenile.  Indeed, Rosales is most

---

[7]   Rosales acknowledges, as the Gilbert court made clear, that the absence of a friendly adult, while an "important consideration" does not in and of itself render a statement involuntary.  Gilbert, 488 F.3d at 792 ("despite Gallegos' forceful language as to the importance of a friendly adult  … subsequent decisions have revealed that the absence of a parent or other friendly presence during the interrogation, although it remains an important consideration, is not dispositive vis-à-vis the voluntariness of a juvenile's confession" ). Id at 792.

[8]   As noted above, Rosales was born on June 16, 1989, was eighteen at the time of the Harris Bank robbery and therefore was, in a strict legal sense, an adult when the robbery took place.  18 U.S.C. § 5031.

accurately described as a badly damaged child, well behind any normal teenager. Although

Rosales was a high school senior, she was a special education student who had a junior high

reading level, was not attending classes and could have received little benefit from whatever

educational assistance she did receive in previous years given her severe mental illness

(including an extensive hospitalization and three suicide attempts) and an unstable,

constantly shifting home environment. The hand-written statement produced by the

government is indelible proof of her severe cognitive limitations:

> I Jessica Rosales talked to Abraham about what going to happed [sic] on Dec I
> help think about what is going to happen and I and Roberto walk 11/2 streets
> away from the bank and Roberto walked away from the spot where Abraham was
> going to meet up at. Abraham get there but Roberto was around then we all meet
> back at home to Chicago to see Abraham causin [sic] than smoked weed and
> when [sic] out to eat than [sic] whent [sic] back to the home and that when the
> cops get there.

Written Statement Of Jessica Rosales, attached hereto as Exhibit D. This is the writing of

a special needs child, not an adult or even a teenager. Even under the best of

circumstances, such a person needs a great deal of assistance and family support for daily

living and learning. Rosales never has had any of these things. And she did not have

anything like these resources when she was asked to make what almost certainly was the

most monumental decision of her life to date: to waive her rights and speak with law

enforcement officers. Because the reality here is that Rosales was in every way that

mattered a very unfortunate child and not an adult in any real sense, this Court, assessing

the totality of the circumstances, should apply the standards governing juvenile

statements to Rosales' waiver of rights and statements.[9]

---

[9]     Rosales acknowledges that there is authority contrary to the basic premise that she should be
treated as a juvenile despite the fact that she had attained the age of eighteen at the time of the interview.
See, e.g., United States v. Contreras, 372 F.3d 974, 978 (8th Cir. 2004) ("Contreras argues that as an
eighteen year old, he was too young to give consent voluntarily. We disagree."). Rosales respectfully

Second, application of such rules here leads ineluctably to the conclusion that Rosales' waiver of rights and statements – made without the assistance of her mother or any friendly adult – should be deemed involuntary and suppressed.  The relevant facts and circumstances surrounding Rosales' waiver of rights and subsequent statements are the following:

(a) **Significant Cognitive Limitations:**  As noted above, Rosales is a special education student who has especial trouble with reading and writing and reads at a junior high school level.  Her written statement – with its broken, disjointed, grammatically incorrect statements and numerous misspelled words – confirms these difficulties;

(b) **Disturbed Emotional History:** As noted above, Rosales had a long history of mental illness and serial suicide attempts;

(c) **Lack Of Access To Mother Or Other Friendly Adult:**  Rosales was not allowed to speak to her mother to determine whether or not to waive her rights or to make a statement.  Rosales' mother was present at the Berwyn Police station, asked to see her daughter and was denied access to her.[10];

(d) **Lack Of Experience With Criminal Justice System:** Rosales had had but one juvenile arrest, which did not result in a conviction.  She thus had little familiarity with the criminal justice system;

---

submits that this authority is distinguishable because of the unique circumstances present here as detailed above, including but not limited to her cognitive limitations and history of mental illness

[10]     Notably, had Rosales been just a little under six months younger, federal law would have required, inter alia: immediate notification of her mother that she had been arrested, advice of rights "in language comprehensible to a juvenile" and appearance before a Magistrate Judge "forthwith" and in no event could such appearance be delayed more than a "reasonable period of time."  18 U.S.C. § 5033.

(e) **Statement That Speaking To Law Enforcement Would Make Everything "Alright," That Rosales Would Have Nothing "To Worry About," That Rosales "Could Go Home" And Statement That Rosales Could Speak To Her Mother *After* Being Questioned":** Berwyn Officers told Rosales both that (1) if she spoke to law enforcement, "everything would be alright," she would have nothing "to worry" about and she could "go home" and (2) she would have to wait until after she was questioned to speak to her mother. These statements made it difficult – indeed, impossible – for Rosales to correctly weigh her options in deciding whether to waive her rights and speak to law enforcement agents; see infra,

(f) **Lateness Of The Hour:** Rosales waived her rights at 11:00 pm and waived the timing of her initial appearance at midnight.  Statements produced by the government suggest that Rosales awoke very early that day, perhaps before 5:00am.  She thus had been awake a very long time when interviewed;

(g) **Rosales' Youth:** As noted above, although Rosales had reached the biological age of eighteen, she was, in every way that counted, a child with very significant limitations at the time of her interview by law enforcement agents.

The law requires that a waiver of rights and statement be both knowing and voluntary.   Butler, 360 F.3d at 799 ("a voluntary relinquishment of a known right occurs when a waiver is the product of a free and deliberate choice rather than intimidation, coercion or deception.") (quotations and citations omitted).  Under the above circumstances, Rosales' waiver of rights and statements were neither knowing nor voluntary.  She was, whether intentionally or not, encouraged to believe that talking to law enforcement agents would make everything "alright,"

-10-

that she would have nothing "to worry about," that she "could go home" and that she would have to wait until after she had been questioned to speak to her mother. And it was this uninformed, naive belief that she would have nothing to worry about and would be able to go home that led to waiver and statements.

In fact, nothing could have been further from truth, as anyone without Rosales' limitations readily would have seen. Both Lira and Navar – twenty one year old men in desperate straits – already had made statements implicating Rosales. <u>See</u>, Rosales Motion To Sever (describing Lira and Navar statements). In the wake of these statements, Rosales was right in the cross-hairs of law enforcement agents when she was asked to waive her rights and make a statement. The notion that "everything would be alright," that Rosales would have "nothing to worry about" and that Rosales "could go home" was thus wildly off base.

Rosales could – and should -- have insisted on seeing her mother before making the decision to waive her rights and law enforcement agents would have had no choice but to allow such a consultation. Her mother could have suggested that she not answer any questions, that she speak to an attorney before making a statement or summon an attorney to be present when she did so or at a minimum her mother would have been present to help Rosales address the agents' questions.

But especially acting on her own, Rosales was wholly incapable – especially in light of her interaction with law enforcement before she was asked to waive her rights – of properly assessing the consequences to her of waiving her rights. Her waiver thus was neither knowing nor voluntary. It was not the product of free and deliberate choice within the meaning of the law.

**<u>Third</u>**, even if this Court declines to treat Rosales as a juvenile, Rosales respectfully submits that the statement still should be suppressed. The principal difference between the

judicial standards governing adult and juvenile statements is that the absence of a parent or other interested adult is a significant factor that, while not dispositive, weighs heavily in favor of suppression in the case of juvenile statements.  Here, even in the absence of this factor, which weighs heavily in favor of suppression, every other factor cited above remains operative and relevant and favors suppression.  In short, the fact remains that Rosales did not make a knowing and voluntary waiver of rights and statements even if she had no right to have her mother present to help her and even if this Court opts to treat her as an adult.

**Fourth**, Rosales respectfully submits that this Court should hold an evidentiary hearing on this Motion because, Rosales respectfully submits, this Motion meets the standard for holding such a hearing.  See United States v. McGaughy, 485 F.3d 965, 969 (2007) ("…a district court need conduct a hearing only when the allegations and moving papers are sufficiently definite, specific and non-conjectural and detailed enough to conclude that a substantial claim is presented and that there are disputed issues of material fact which will affect the outcome of the motion.") (internal quotations and citations omitted).

**CONCLUSION**

WHEREFORE, defendant Jessica Rosales respectfully requests that this Court hold an evidentiary hearing on this Motion and enter an Order suppressing oral and written statements that she made to FBI agents while in the custody of the Berwyn Police Department late in the evening of December 4, 2007 and possibly in the very early morning hours of December 5, 2008.

Date: March 11, 2008.                    Respectfully submitted,

                                         JESSICA ROSALES


                              By:    /s/Timothy P. O'Connor
                                         Her Attorney

Timothy P. O'Connor
MEYER & O'CONNOR, LLC
Suite 2210
20 S. Clark
Chicago, IL 60603
(312) 346-9000

## Index To Exhibits

**Description**                                                                                      **Designation**

Rosales FD-395 Advice Of Rights…..……………………………………………Exhibit A

Rosales Waiver Of Timing Of Appearance Before Magistrate
Judge……………………..……………………………………………………………..Exhibit B

FBI Report OF Rosales Oral Statement……………………………………………….Exhibit C

Written Statement Of Rosales……………………………………………………Exhibit D

**Exhibit A**
**Rosales FD-395 Advice Of Rights**

**Exhibit B**
**Rosales Waiver Of Timing Of Appearance Before Magistrate Judge**

**Exhibit C**
**FBI Report OF Rosales Oral Statement**

**Exhibit D**
**Written Statement Of Rosales**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that he caused a copy of the foregoing DEFENDANT ROSALES' MOTION TO SUPPRESS AND FOR EVIDENTIARY HEARING to be served upon:

AUSA Yussef Dale
United States Attorney's Office
219 S. Dearborn St.
Chicago, IL 60604

Patrick W. Blegen
Blegen & Garvey
Suite 1437
53 W. Jackson Blvd.
Chicago IL 60604

Sergio F. Rodriguez
Federal Defender Program
55 East Monroe
Suite 2800
Chicago IL 60603

by electronic service on this 11th day of March, 2008.

/s/ Timothy P. O'Connor